# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

CHRYSTAL GLENN,

    Plaintiff,

    v.

VIOLETA HRGOTA,

    Defendant.

Case No. 16-2092-JAR

## MEMORANDUM AND ORDER

Plaintiff Chrystal Glenn filed this suit against Defendant Violeta Hrgota, a night response detective with the Kansas City, Kansas Police Department, alleging Defendant wrongfully detained her in violation of her Fourth Amendment rights. The matter before the Court is Defendant's Motion for Summary Judgment (Doc. 35). The motion is fully briefed and the Court is prepared to rule. For the reasons stated below, the Court finds Defendant is entitled to qualified immunity and grants summary judgment in Defendant's favor.

## I. Standards for Summary Judgment on Qualified Immunity

Defendant moves for summary judgment under the doctrine of qualified immunity. Qualified immunity protects public officials performing discretionary functions unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."[1] Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.[2]

---

[1] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[2] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

As the Tenth Circuit explained in *Rojas v. Anderson*,³ "because qualified immunity is designed to protect public officials from spending inordinate time and money defending erroneous suits at trial," the qualified immunity defense triggers a modified summary judgment standard.⁴ The initial burden rests on the plaintiff, rather than the defendant; and the plaintiff must first "clear two hurdles:" (1) demonstrate that the defendant violated his constitutional or statutory rights; and (2) demonstrate that the right was clearly established at the time of the alleged unlawful activity.⁵ The court may decide the appropriate order to consider these issues.⁶ Only if the plaintiff clears these hurdles does the burden shift back to the movant defendant to make the traditional showing that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law.⁷

## II. Factual Background

The following facts are uncontroverted or viewed in the light most favorable to Plaintiff as the nonmoving party. In February 2014, Plaintiff lived in a house with her fiancé Jesse Hernandez, her three children (ages 13, 7, and 23 months), and her mother, Kathy Snoderly. Two other adults and four children also lived at the home.

Shortly before 5:00 a.m. on February 19, 2014, Plaintiff woke to find her twenty-three month old son ("J.G.") unresponsive and breathing abnormally. Plaintiff immediately alerted her mother, who performed CPR to resuscitate the boy while Plaintiff called 9-1-1. Police arrived at the home first. Emergency Medical Services ("EMS") arrived shortly thereafter. Upon arrival,

---

³ 727 F.3d 1000 (10th Cir. 2013).

⁴ *Id*. at 1003.

⁵ *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

⁶ *Camreta v. Greene*, 131 S. Ct. 2020, 2031–32 (2011).

⁷ *Rojas*, 727 F.3d at 1003.

2

EMS crewmembers began performing CPR and other first aid protocol. Due to the severity of J.G.'s condition, EMS rushed J.G. to Children's Mercy Hospital for further treatment. According to Plaintiff, EMS did not ask her to accompany them and left before she had a chance to fully dress.

At the relevant time, Defendant was assigned to the Kansas City, Kansas Police Department's night response unit. As a night response detective, her job was to respond to crime scenes, to direct police investigation, and to take witness statements from victims, witnesses, and suspects for all crimes except child abuse, child death, suspicious death, and homicide. For these crimes, Defendant must secure the scene, gather general facts, and page the Major Case unit. Major Case detectives direct the investigation of these cases and take recorded witness statements.

At 5:22 a.m., after EMS left with J.G., Defendant arrived at Plaintiff's residence. Upon arrival, patrol officers at the scene briefed Defendant — a child without any known medical condition was rushed to the hospital.[8] Defendant then introduced herself to Plaintiff and questioned her about the circumstances surrounding her son's health conditions. Defendant observed the house was in complete disarray. Decaying food, cigarette butts, empty beer cans, and garbage littered the floors.

At 5:32 a.m., a physician at Children's Mercy Hospital pronounced J.G. dead. Shortly thereafter, hospital staff called Plaintiff and asked her to come to the hospital. Plaintiff told the hospital that Defendant would not allow her to leave her residence. At the hospital's request, Plaintiff passed the phone to Defendant, who took the call outside of Plaintiff's hearing. At this

---

[8] Plaintiff objected to any statements by the patrol officers as hearsay. The Court overrules this objection. These statements are not hearsay because they are not offered to prove the truth of the matter asserted. Instead, they explain Defendant's state of mind at the relevant time and what led her to believe there may have been foul play. In any case, police may rely on hearsay of another officer to form the basis of reasonable suspicion. *United States v. Merritt*, 695 F.2d 1263, 1270 (10th Cir. 1982), *cert. denied*, 461 U.S. 916 (1983).

time, hospital staff told Defendant that J.G. had died. Neither Defendant nor the hospital told Plaintiff that J.G. had died.

Defendant paged Major Case detectives upon learning of J.G.'s death. To secure the scene, the household residents were not allowed to go the back of the house where the bedroom was located, and two uniformed officers were stationed at the door to prevent anyone from leaving the residence.[9]

The Major Case detectives arrived on scene about an hour later, at approximately 6:40 a.m. Defendant left the residence shortly thereafter to obtain a search warrant. After the Major Case detectives took Plaintiff's recorded statement, she was allowed to leave at approximately 7:30 a.m. Plaintiff immediately proceeded to the hospital, where she found out her son had already died. An autopsy later concluded that J.G. died of natural causes.

## III. Discussion

Plaintiff alleges Defendant had no probable cause to believe that she had committed any offense when Defendant detained her for two hours and prevented her from being with her son during his last moments.[10] Defendant claims she did not violate the Fourth Amendment by detaining Plaintiff because she reasonably suspected that Plaintiff was involved in J.G.'s death.[11] Even if the detention was unreasonable, Defendant argues that she did not violate clearly established law, which entitles her to qualified immunity.[12]

---

[9] Doc. 41, Hrgota Dep. at 81-84.

[10] Doc. 41 at 11.

[11] Doc. 36 at 16.

[12] *Id.*

4

### A. Constitutional Violation

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[13] The Supreme Court has defined three types of police-citizen encounters:

> (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.[14]

Plaintiff argues that the duration of her detention was unreasonable and entered the realm of an arrest.[15]

Courts characterize investigative detentions as "limited intrusion[s] on the personal security of suspect[s]."[16] An investigative detention is justified "if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."[17] In comparison, arrests require probable cause to believe that a person committed a crime.[18] Arrests are typically "highly intrusive."[19] The use of firearms, handcuffs, and other forceful techniques indicate an arrest.[20]

---

[13] U.S. Const. amend. IV.

[14] *United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007) (citations omitted).

[15] Doc. 41 at 11.

[16] *Maresca v. Bernalillo Cty.,* 804 F.3d 1301, 1309 (10th Cir. 2015), *cert. denied*, 136 S. Ct. 2509 (2016) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

[17] *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012) (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 (1989) and *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

[18] *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (citing *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000)).

[19] *Oliver*, 209 F.3d at 1186.

[20] *Cortez,* 478 F.3d at 1115–16 (citing *United States v. Melendez–Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994)).

The uncontroverted facts in this case, viewed in the light most favorable to the Plaintiff, support the finding that this was an investigatory detention rather than an arrest. Police responded to a 9-1-1 call and entered the dwelling with consent. A child died unexpectedly. Defendant took statements and posted guards at the front door. None of the police officers ever touched or physically restrained Plaintiff. Plaintiff was not handcuffed and had access to her phone during the detention. Under these circumstances, Defendant did not effectuate a full custodial arrest of Plaintiff; she detained Plaintiff so the Major Case detectives could further investigate what happened.

To determine whether an officer had reasonable suspicion to detain someone, the Court examines the "totality of the circumstances, asking 'whether the detaining officer ha[d] a particularized and objective basis for suspecting wrongdoing'" at the time.[21] "[R]easonable suspicion may be supported by an 'objectively reasonable' good faith belief even if premised on factual error.[22]

Here, Defendant had a particularized and objective basis to reasonably suspect Plaintiff of wrongdoing. Defendant suspected that Plaintiff or her fiancé had committed the crime of homicide by smothering J.G. to stop his crying and screaming.[23] Plaintiff and her family had reported to Defendant that J.G. had flu-like symptoms the night before, was vomiting, fussy, and screaming throughout the night. However, Defendant observed a dry bowl next to the bed with no signs of vomit.

---

[21] *United States v. Salazar*, 609 F.3d 1059, 1068 (10th Cir. 2010) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

[22] *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (citing *United States v. Walraven*, 892 F.2d 972, 974–75 (10th Cir.1989)).

[23] Doc. 36, Hrgota Aff. at 4.

Alternatively, she suspected J.G. was the victim of neglect due to Plaintiff's failure to provide details regarding J.G.'s care the previous day and the condition of the house. Cigarette butts, decaying food, empty beer cans, clothes, and trash littered the floors and surfaces throughout the home. Defendant also observed a disabled child wearing a diaper with overflowing feces. All of these facts led Defendant to believe that J.G. could have ingested something toxic or became ill due to neglect.[24] Given the totality of the circumstances, the Court finds that Defendant had a particularized and objective basis for suspecting wrongdoing on Plaintiff's part.

Plaintiff urges the Court to consider the EMS report, the Children's Mercy Hospital record, and the other officers' reports, which all showed J.G. was not the victim of any physical abuse. The Court cannot consider these reports because the test for reasonable suspicion is what a reasonable officer could have known at the time.[25] None of these reports were available to Defendant at the time of detention. Officer Cobbins' report noted he arrived at the hospital at 7:17 a.m. and that J.G. had no signs of visible injuries.[26] Defendant had already left the residence when Cobbins made that observation. Furthermore, the EMS report, the hospital records, and the autopsy report were not available until after the detention ended. But even if Defendant was aware that there were no signs of physical abuse on J.G., Defendant's suspicion that Plaintiff may have caused J.G.'s death was still reasonable because deaths caused by smothering or ingesting a toxic substance leave no apparent physical marks.

---

[24] *Id.* at 5.

[25] *White v. Pauly*, 137 S. Ct. 548, 550, (2017) ("Because this case concerns the defense of qualified immunity, however, the Court considers only the facts that were knowable to the defendant officers").

[26] Doc. 41-4.

Plaintiff cites *Walker v. City of Orem*[27] to assert that a two-hour detention was unreasonable. In *Walker*, the Tenth Circuit held 90 minutes was an unreasonable amount of time to hold a witness to a shooting.[28] The court went on to explain "[w]hat little authority exists on this question suggests that police have less authority to detain those who have witnessed a crime for investigatory purposes than to detain criminal suspects."[29] Here, Defendant considered Plaintiff a suspect, not a witness. Therefore, *Walker* is inapposite.

The Supreme Court imposes no rigid time restrictions on investigative detentions.[30] "Rather, the length of the stop and the potential intrusion on an individual's Fourth Amendment rights must be juxtaposed against 'the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.'"[31] The Supreme Court has explained that the duration of an investigative detention is reasonable if the police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly."[32] The Supreme Court cautioned courts to "not indulge in unrealistic second-guessing."[33]

Here, the detention lasted two hours largely due to the delay in the Major Detectives' arrival on the scene. Defendant followed protocol and alerted her superiors promptly. But because the call was so early, Major Case detectives were not yet on duty and needed time to

---

[27] 451 F.3d 1139 (10th Cir. 2006).

[28] *Id.* at 1150.

[29] *Id.* at 1148.

[30] *United States v. Sharpe*, 470 U.S. 675, 685 (1985); *United States v. Rosborough*, 366 F.3d 1145, 1150 (10th Cir. 2004) ("there is no absolute rule for determining how long an investigative detention may continue before it becomes unreasonable under the Fourth Amendment").

[31] *Rosborough*, 366 F.3d at 1150 (citing *Sharp*, 470 U.S. at 685, and *United States v. Jones*, 44 F.3d 860, 871 (10th Cir. 1995)).

[32] *Sharpe*, 470 U.S. at 686.

[33] *Id.*

dress and travel across the city to Plaintiff's residence. Although it may have been insensitive for Defendant to not allow Plaintiff to go to the hospital with a police escort, the Court cannot conclude that waiting a little over an hour for the Major Detectives to arrive on scene and take Plaintiff's recorded statement was unreasonable.[34]

**B.     Clearly Established Law**

To overcome qualified immunity, plaintiffs must also show that the law was clearly established at the time of the violation. To make this determination, the Court asks if "'the right [was] sufficiently clear that a reasonable officer would understand that what he is doing violates that right.'"[35] The right must be particularized to survive summary judgment, meaning that "there must ordinarily be a Supreme Court or Tenth Circuit decision on point, or clearly established weight of authority from other courts."[36] In the Fourth Amendment context, specificity is especially important because "the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine…will apply to the factual situation the officer confronts.'"[37] "'General statements of the law are not inherently incapable of giving fair and clear warning' to officers, but 'in the light of pre-existing law the unlawfulness must be apparent.'"[38] The Tenth Circuit requires the following before declaring a law to be clearly established: (1) "a Supreme Court or Tenth Circuit decision on point," or (2) a showing

---

[34] *See e.g.*, *Muehler v. Mena*, 544 U.S. 93, 100 (2005) (holding a two to three hour detention in handcuffs was reasonable); *United States v. Cervine*, 347 F.3d 865, 872–73 (10th Cir. 2003) (holding fifty minute detention of driver was reasonable); *United States v. Shareef*, 100 F.3d 1491, 1507 (10th Cir. 1996) (holding forty-five minute detention reasonable); *United States v. Hbaiu*, 202 F. Supp. 2d 1177, 1184 (D. Kan. 2002) (holding detention lasting one hour, 45 minutes was reasonable where delay was attributable to circumstances outside troopers' control.).

[35] *Mecham v. Frazier*, 500 F.3d 1200, 1205–06 (10th Cir. 2007) (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)); *Sause v. Bauer*, – F.3d –, 2017 WL 2641070 at *3(10th Cir. June 20, 2017).

[36] *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995).

[37] *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

[38] *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997) and *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

that "the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains."[39]

Plaintiff's discussion of clearly established law relies on general propositions from a number of cases.[40] These general propositions do not make the unlawfulness of Defendant's actions apparent, such that a reasonable officer in Defendant's position would clearly understand detaining Plaintiff under these circumstances violated her Fourth Amendment rights. The Court's research revealed no authority from either the Tenth Circuit or the Supreme Court that says a two-hour detention of a suspect to await the arrival of the lead investigator for a child death case is unconstitutional.

The sole case the parties discussed containing a similar fact pattern was *Seymour v. City of Des Moines*,[41] an Eighth Circuit case from 2008. In *Seymour*, a father was detained in his home after calling 911 because his infant son had stopped breathing. While the mother accompanied the child to the hospital, the father stayed home with the remaining two children, intending to join his wife once someone arrived to watch the children. The father told the officers at the scene "that the child had been fussy; that the father had twice tried unsuccessfully to reach the mother on her cell phone; that the child eventually fell asleep; that when the mother later returned the father's call the father told her that it was time for the child to be fed; and that

---

[39] *Sause*, 2017 WL 2641070 at *3 (citing *Fancher v. Barrientos*, 723 F.3d 1191, 1201 (10th Cir. 2013) (quoting *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007))).

[40] Doc. 41 at 13-17 (citing *Cortez v. McCauley*, 478 F.3d 1108, 1123 (10th Cir. 2007) (police cannot effect an investigative detention without reasonable suspicion; police cannot arrest without probable cause); *Lundstrom v. Romero*, 616 F.3d 1108, 1125–26 (10th Cir. 2010) ( stating police officers should interview witnesses, investigate basic evidence, and inquire if a crime committed before arrest or detention); *Dunaway v. New York*, 442 U.S. 200, 212 (1979) (holding arrest must be supported by probable cause); *Jones v. Hunt*, 410 F.3d 1221 (10th Cir. 2005) (explaining "free to leave" standard; seizures without any legal justification violated the Fourth Amendment); *Elder v. Holloway,* 510 U.S. 510 (1994) (finding police detective on notice that Fourth Amendment applies to her); *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (discussing "free to leave" standard); *United States v. Hill*, 199 F.3d 1143,1147–48 (10th Cir. 1999) (setting forth eight factors to determine whether a person was, in fact seized; explaining totality of circumstances applies to determine if person felt free to terminate encounter with government officials).

[41] 519 F.3d 790 (8th Cir. 2008).

when the mother got home and checked on the infant, he was not breathing."[42] The officers on the scene told the father that he was to remain at the home until detectives from the child abuse investigative team arrived. The infant died shortly after the father arrived at the hospital with Sudden Infant Death Syndrome as the likely cause of death.

The Eighth Circuit held that the officers did not have reasonable suspicion to detain the father because these facts were not inherently suspicious and the officers did not present evidence that their training might alert them it was suspicious.[43] The Eighth Circuit, however, concluded that the defendants had made a reasonable mistake as to the legality of their actions given: 1) the detective planned on arriving promptly to the scene, 2) the state has a strong interest in investigating child death cases, and 3) child deaths can be difficult to investigate and that it is important to interview the person who had cared for the child immediately before the incident.[44] The Eighth Circuit ultimately concluded the defendants were entitled to qualified immunity with respect to the detention, stating: "we cannot say that an officer conducting a child death investigation who pursued a means of investigation that he thought would be fairly unintrusive and which he considered useful in the circumstances made an unreasonable mistake regarding the legality of his actions.[45]

Plaintiff argues *Seymour* is inapposite because the detective mistakenly believed that the father wanted to remain at home to watch his remaining two children and officers on the scene had failed to communicate to the detective that the father had repeatedly requested to go the hospital. Plaintiff argues that no such misunderstanding or communication gaps were present in

---

[42] *Id*. at 793.
[43] *Id*. at 798.
[44] *Id*.
[45] *Id*. at 798–99.

11

this case.⁴⁶ The Court finds this factual distinction insufficient to discount *Seymour*. Additionally, here, Defendant had reasonable suspicion to suspect child neglect or abuse given the condition of the house and the contradictory physical evidence that J.G. had been vomiting. But even if Defendant lacked reasonable suspicion to detain Plaintiff and the detention was unduly prolonged, the Court cannot say that a reasonable officer in Defendant's position would have known that Plaintiff's detention was too lengthy or intrusive to pass constitutional muster. Plaintiff has failed to demonstrate that it was clearly established law that officers cannot detain the person who cared for the child immediately before the child's death for investigation. The Court finds Defendant is thus entitled to qualified immunity.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (Doc. 35) is **granted**.

**IT IS SO ORDERED.**

Dated: June 26, 2017

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

⁴⁶ Doc. 41 at 17.